UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| (1) GARY CEDERQUIST,<br>(2) CALVIN BUTNER,<br>(3) PERRY MENDES,<br>(4) JOEL ROGERS, and<br>(5) SCOTT CAMARA, | Case No. 24-cr-10024-IT |
| Defendants. | |

## GOVERNMENT'S TRIAL BRIEF

The United States of America hereby submits this trial brief in the above-captioned case in anticipation of the trial scheduled to begin on April 14, 2025.

## I.    OVERVIEW OF CHARGED CONDUCT

The indictment charges the defendants for their participation in a years-long scheme to provide passing scores on the skills test required to obtain a Commercial Driver's License (CDL) to applicants who took only a portion of the required test or, in some cases, never took a test at all.  The bulk of the charges center on members of the Massachusetts State Police (MSP) CDL Unit, tasked with administering the CDL skills test and, at bottom, serving as the gatekeepers in Massachusetts for who can get a CDL.  A CDL is required in order to drive a commercial vehicle, like a tractor trailer, a tanker truck, or a school bus, and CDL skills tests are designed, above all else, to promote public safety.  Indeed, the CDL skills test, when administered as required during all times relevant to the charged conduct, was difficult: the pass rate in Massachusetts was below 50%.

At trial, the government expects to prove that four troopers in the MSP CDL Unit – Defendants Gary Cederquist, Calvin Butner, Perry Mendes, and Joel Rogers – agreed to give passing scores to certain "golden" applicants even if they failed or took less than a complete skills test.  The evidence will show that five golden applicants (Applicants-1, -4, -7, -13, and -14) were given passing scores even though they failed the test.  The evidence will show that Cederquist, Butner, and Mendes gave other applicants passing scores even though the applicants failed the test, took less than a complete test, or did not take the test at all.

The evidence will also show that Cederquist, Butner, and Mendes conspired to extort a stream of benefits from Eric Mathison; that Cederquist and a person identified in the indictment as the Friend Conspirator conspired to extort a new driveway and a snowblower for Cederquist's benefit; and that Cederquist and a person identified in the indictment as the Fence Company Owner conspired to extort a granite post and mailbox for Cederquist's benefit – all in exchange for preferential treatment in connection with CDL skills tests.

The defendants are charged in a 74-count indictment divided into both conspiracy counts and substantive counts: conspiracy to falsify records (Counts One-Three); conspiracy to commit extortion (Counts Four-Six); substantive extortion (Counts Seven-Nine); honest services mail fraud (Counts Ten-Fifteen); falsification of records (Counts Sixteen-Forty-Six); false statements (Counts Forty-Seven-Seventy-Three); and perjury (Count 74).  This trial brief outlines the requirements and parameters for CDL testing; describes certain evidence the government expects to introduce for each charged count; and outlines potential and pending legal disputes. Additional potential issues, along with proposed solutions where possible, are included as well.

## II.    BACKGROUND REGARDING CDL SKILLS TESTS

The Federal Motor Carrier Safety Administration (FMCSA), part of the U.S. Department of Transportation, is tasked with the prevention of commercial motor vehicle-related fatalities and injuries.  To accomplish this goal, the FMCSA establishes the requirements and standards for the testing and licensing of commercial motor vehicle drivers nationwide.  *See* 49 C.F.R. Part 383.  The states, which administer CDL tests and issue the licenses, must adhere to these federal requirements.  *See id.* Part 384.

Through funding agreements with the FMCSA, a non-profit organization called the American Association of Motor Vehicle Administrators (AAMVA) designs the test and scoring system.  Members of AAMVA include the RMVs/DMVs of every state, every U.S. territory, and the District of Columbia.  Through AAMVA, these various jurisdictions work together to design a nationwide test that is acceptable to all of them and their different roadways.  AAMVA documents the test and scoring system in two manuals, a publicly available manual for applicants, and a confidential manual for test administrators that contains greater detail, including the scoring system (*CDL Examiner's Manual*).  Both manuals must be reviewed and approved by the FMCSA.  After the FMCSA approves the manuals, AAMVA disseminates them to the states.[1]

CDLs are divided into three levels, or classes: Class A, for combination vehicles like tractor-trailer trucks; Class B, for heavy straight vehicles, like school buses and box trucks; and

---

[1] The *CDL Examiner's Manual* is a proprietary, copyrighted document published by AAMVA and produced to the defendants in this case pursuant to a protective order.  Dkt. No. 56. Because the contents of this manual are relevant, probative, and necessary to the government's case-in-chief, the manual has been marked and will be introduced at trial.  Given the proprietary nature of the manual and in an effort to satisfy AAMVA's request that the manual not itself become public, the government expects to request that the Court seal this exhibit after trial.

Class C, for smaller commercial vehicles.  49 C.F.R. § 383.91(a).  This case involves only Class A and Class B licenses and skills tests.

In order to obtain a CDL, an applicant must first get a Commercial Learner's Permit by passing a "knowledge test" for whichever class of CDL they are seeking.  In Massachusetts, applicants take these tests on a computer at an RMV service center.  Unless they qualify for an exemption, applicants must also take and pass a U.S. Department of Transportation medical exam.

Once a CDL applicant passes the written knowledge test and obtains a Commercial Learner's Permit, they are allowed to practice driving a commercial vehicle on open roads as long as they are accompanied in the vehicle by someone who holds a CDL in the class of the vehicle being driven.  49 C.F.R. § 383.25(a)(1).  Many CDL applicants also enroll in truck driving school to train, which regularly runs into the thousands of dollars.  A CDL applicant must then schedule and pass a CDL skills test in order to obtain their license.

Applicants are required to bring several documents with them to their skills test, including their CDL Road Test Application, driver's license, Commercial Learner's Permit, and medical card (if applicable).  They are also required to be accompanied by their sponsor, who must hold a CDL for the class of vehicle for which the applicant is testing.  The CDL Road Test Application includes sections for, among other things, the applicant's biographical information and signature; the class of CDL for which the applicant has a permit; the make, year, and registration of the test vehicle; whether the test vehicle has air brakes and/or a manual transmission; and the gross vehicle weight rating (GVWR) of the test vehicle.  The application has sections for the sponsor's information and signature and for where the examiner writes

whether the applicant has passed or failed the test.  There is also a line for the examiner's signature.

The skills test must be taken in a vehicle that meets the specifications for whichever class of CDL the applicant is seeking – that is, if the applicant is seeking a Class A CDL, they must use a Class A vehicle for their test.[2]  The test has three parts:

- First, an applicant is asked to conduct a vehicle inspection or "pre-trip inspection," which involves the examiner testing the applicant's knowledge by asking them to identify and answer questions about various parts of the vehicle. If the test vehicle has air brakes, the applicant must also demonstrate their aptitude in engaging the air brakes.  If the applicant fails the pre-trip inspection, they are not allowed to continue the test until a later date.

- Second, once the applicant passes the vehicle inspection portion of the test, they move on to Basic Control Skills (BCS), during which the applicant is required to perform certain maneuvers in their test vehicle.  At all times relevant to the charges in this case, applicants were required to perform three maneuvers.  If the applicant fails the BCS, they are not allowed to continue the test until a later date.

- Finally, once the applicant has passed both the vehicle inspection and BCS portions of the test, the applicant must pass the road test, during which the applicant travels on an open roadway with various requirements, with the examiner in the passenger seat.  *See* 49 C.F.R. § 383.113.

---

[2] The CDL issued to an applicant must also match the test vehicle with respect to the type of brakes and transmission; for example, if the test vehicle has an automatic transmission, the applicant will qualify for a CDL that bears a restriction prohibiting them from driving a commercial vehicle with a manual transmission.  49 C.F.R. § 383.95.

The examiner must be an active observer during all three parts of the skills test and grade the applicant throughout the test on a double-sided CDL Skills Test Score Sheet. For the vehicle inspection part of the test, the examiner notes on the score sheet how many questions the applicant answered correctly. The examiner also notes the type of transmission the test vehicle has, as well as whether the test vehicle has air brakes (and, if so, whether the applicant passed the air brakes test). For the BCS portion of the test, the examiner notes which maneuvers they asked the applicant to complete and how many errors the applicant made. During the road test, the trooper checks off any errors made by the applicant and then calculates the total number of errors.

In addition to filling out the CDL Skills Test Score Sheet, the examiner indicates that an applicant has passed different portions of the skills test by stamping the back of the applicant's Commercial Learner's Permit. More specifically, the back of the permit contains blocks for the vehicle inspection test, the air brakes test, the road test, and different maneuvers. If an applicant passes one of these test segments or completes one of the maneuvers, the examiner stamps that block(s) and returns the permit to the applicant.

In Massachusetts, the CDL skills test is offered at a variety of sites set up for the purpose of CDL testing and is administered by members of MSP's CDL Unit. CDL skills tests are scheduled for a specific location, date, and time. At all times relevant to the charged conduct in this case, appointments were scheduled in 90-minute blocks, with 30 minutes allocated for each of the three parts of the test. A particular MSP examiner was assigned to a particular test either by a scheduler at the RMV or a member of the CDL Unit. The scheduling information was recorded in the Commercial Skills Test Information Management System (CSTIMS), a database developed by AAMVA as part of its agreement with the FMCSA. When the test was over, the

6

examiner recorded the applicant's scores in CSTIMS.  Each CDL examiner had a CSTIMS account, which they could access from their MSP-issued cruiser laptops.

 For every CDL applicant, extensive data was logged into CSTIMS, including the applicant's name, their driver's license number and state, the test segment scheduled, the person who scheduled the test segment and the date and time they did so, the name of the examiner, the test site, the road test "route identifier," the reason for the test (*e.g.*, previous test failure), the date and time when the test segment began and ended, whether the applicant passed or failed or the test was canceled, the test score, the vehicle class, whether the test vehicle had air brakes, whether the test vehicle had a manual transmission, the test vehicle type, and the name of the person who last modified the applicant's test results in CSTIMS and the date and time at which they did so.

The trooper who administered an applicant's CDL skills test was responsible for ensuring the numerical scores they had written on the CDL Skills Test Score Sheet were entered into CSTIMS.  CSTIMS then calculated whether the scores were sufficient to pass the test segment.[3] The RMV's computer system received test result data from CSTIMS on a daily basis.  If the RMV learned that an applicant had passed all portions of the skills test, had paid the required fees, and had no other outstanding issues, it authorized the issuance of a CDL by electronically notifying a vendor called IDEMIA, which manufactured the license and mailed it to the licensee.

---

[3] For example, an applicant for a Class A license had to score a minimum of 67 points on the pre-trip if their vehicle had air brakes, or 61 if it did not. An applicant for a Class B license had to score a minimum of 27 points on the pre-trip if their vehicle had air brakes, or 24 if it did not.  Applicants for both Class A and Class B licenses were permitted a maximum of 12 errors on the BCS segment and a maximum of 30 errors on the road test.

### III.    CASE-IN-CHIEF EVIDENCE

Background Testimony and Evidence Relevant to All Counts

The indictment in this case centers on CDL skills testing, a topic likely to be outside the mainstream for many jurors, and in particular deviations between (1) federal requirements of properly administered CDL skills tests, and (2) partial (or nonexistent) tests administered by the four charged MSP trooper defendants.  Testimony and evidence regarding federal requirements for CDL skills tests, and the defendants' training with respect to those requirements, will be necessary to equip the jury to identify these deviations and reach a verdict.

To that end, the government expects to call several witnesses to introduce and explain CDL testing, how federal requirements are implemented, and how testing is conducted in Massachusetts.  Matthew Poirier of the U.S. Department of Transportation and Jeff Oberdank of AAMVA will testify about the three-part skills test, the *CDL Examiner's Manual*, the interplay between the FMCSA, AAMVA, and the RMV, and how CDL skills tests are supposed to be scored, among other things.  Oberdank will also authenticate a 38-minute compilation of AAMVA training videos illustrating how a CDL skills test was supposed to be administered during the relevant time frame.

MSP Lieutenant Joseph McLaughlin was the unit commander of MSP's Motor Vehicle Regulatory Section (MVRS), which comprises the CDL Unit and two other units, from September 2022 to February 2025.  He will provide background information about the structure of MVRS, what the CDL Unit does, its membership during the time of the conduct alleged in the indictment, training of CDL examiners, the Commercial Learner's Permit, and basic information about CDLs, including the different classes.

Sergeant Jason Macomber, the current supervisor of the CDL Unit, will testify about how CDL examiners scored CDL skills tests, and inputted the scores into CSTIMS, during the period of the conduct alleged in the indictment. Sergeant Macomber will also authenticate a "spherical image" depicting the Stoughton CDL testing site – the only test site at issue in this case – and allowing jurors to view the site through 360-degree images (like Google "Street View").

MSP Detective Lieutenant Michael Blanchette will authenticate the Road Test Applications and Score Sheets that are Exhibits 3-41 and 91-100. He will testify about the manner in which these records were collected and explain what steps were taken to locate missing records.[4]

The trooper identified in the indictment as the Trooper Conspirator will testify about how members of the CDL Unit were trained to be examiners and explain that the *CDL Examiner's Manual* was the "bible" that examiners had to follow.[5]

<u>Count One – Conspiracy to Falsify Records</u>

In Count One, Defendants Cederquist, Butner, Mendes, and Rogers are charged with conspiracy to falsify records, in violation of 18 U.S.C. § 371. Specifically, Count One charges these defendants with conspiring to give guaranteed passing scores to certain CDL applicants – that is, a guarantee that applicants would receive passing scores even if they failed the test, or passed a test that did not meet all of the requirements set forth in the *CDL Examiner's Manual*.

---

[4] Detective Lieutenant Blanchette is currently assigned to MSP's Office of Professional Integrity and Accountability (OPIA). The government does not intend to elicit testimony about the nature of any internal affairs investigation arising out of conduct in this case and, in an abundance of caution, will direct its questioning of this witness only to the necessary authentication and identification of particular records.

[5] The Trooper Conspirator will testify pursuant to an immunity and cooperation agreement.

To prove this conspiracy, the government intends to introduce evidence that the defendants communicated by text message about applicants who would receive guaranteed passing scores and that they referred to an automatic passing score as a "golden handshake" or "golden" for short. The Trooper Conspirator will explain that he heard the term "golden" from Defendants Cederquist, Butner, and Mendes, and that Cederquist asked him to perform "goldens" on three occasions.

This testimony will be corroborated by the text messages in which the defendants discuss specific "golden" applicants. The Trooper Conspirator will read texts in which he asked Cederquist to give Applicant-5 a "golden shake." The remaining "golden" texts will be read to the jury by Homeland Security Investigations Special Agent Timothy Taber.[6]

One "golden" applicant (Applicant-14), who took his test on February 7, 2022, will identify the vehicle in a pole camera video clip for that date (Ex. 89) as the one he used for his skills test. The government will play the clip when the Trooper Conspirator takes the stand; he is

---

[6] Throughout the trial, witnesses who were parties to text communications, including with the defendants, will read those text chains to the jury. Special Agent Taber will read the other text exhibits, all of which are between the defendants (including Eric Mathison, who has pled guilty). Special Agent Taber will also take the stand to introduce the recording and transcript of Defendant Camara's grand jury testimony, which is relevant to the perjury count. Finally, Special Agent Taber will put already-admitted applications, score sheets, and CSTIMS test results reports together for the jury. For example, he will connect the application and score sheet for Applicant-1 (Ex. 38), which identifies the examiner's name only in handwriting no witness will be able to identify, with the CSTIMS report for Applicant-1 (Ex. 2, p.43), which shows that the examiner was Butner. He will also publish any inconsistency between scores written on a score sheet and scores entered into CSTIMS (such as exists with Applicant-1).

In an effort to streamline the government's case-in-chief and prevent potential jury confusion by covering disparate topics out of order, the government requests permission from the Court to call Special Agent Taber to testify about discrete issues as they come up in the normal course of the trial.

expected to testify that the video shows that the driver performed only two maneuvers, not all three as was required.[7]

<u>Count Two – Conspiracy to Falsify Records</u>

In Count Two, Defendants Cederquist and Camara are charged with conspiracy to falsify records, in violation of 18 U.S.C. § 371. Specifically, Count Two charges that Cederquist and Camara conspired to give guaranteed passing scores to four MSP troopers, identified in the indictment as Troopers A, B, C, and D, for Class A licenses.

Troopers A, B, C, and D are all expected to testify that they studied and trained for what they anticipated would be a real and complete CDL skills test. They will explain that they scheduled their skills tests through Defendant Cederquist, who also communicated to them that they would not need to bring either a sponsor or a truck to their skills test. They will explain that on October 5, 2021 (for Troopers A and B) and October 6, 2021 (for Troopers C and D), they arrived at the Stoughton CDL testing site where they met Defendants Cederquist and Camara. Each will describe the "test," which involved sitting in the cab of a truck with no trailer attached (meaning, not a Class A commercial vehicle) with Camara (and never Cederquist), driving

---

[7] The government intends to introduce only four other clips of video taken by the pole camera that was placed outside the Stoughton test site for six months. Exhibit 83 is a clip of a vehicle performing only one maneuver; that driver (Applicant-13) received a passing score. Exhibits 85 and 87 show the same vehicle taking a test three days apart. Special Agent Taber will testify that CSTIMS records show that (a) only one applicant (Applicant-29) took the test on those two dates, and (b) Applicant-29 failed the maneuvers segment during the first test but passed it when he took the test again. The government will play the video from the second test (Ex. 87) when the Trooper Conspirator is on the stand. He is expected to testify that the video shows that the driver performed no maneuvers. Finally, Exhibit 130 is a clip of a truck cab driven by Troopers C and D on October 6, 2021. It shows that the truck did not have an attached trailer and therefore did not qualify as a Class A vehicle – even though Cederquist gave both Troopers C and D passing scores for a Class A license.

around the Stoughton lot with Camara, and briefly going out on the road (also only with Camara).

The troopers' applications will confirm that Camara wrote his name, identification information, and signature in the "Sponsor Information" section of the applications, and information identifying an absent trailer in the "Vehicle Information" section. The troopers' score sheets and CSTIMS test results reports will show that Cederquist gave all four troopers passing scores for a Class A CDL. Text messages between Cederquist and Camara will further corroborate their conspiracy.

<u>Count Three – Conspiracy to Falsify Records</u>

In Count Three, Defendant Cederquist is charged with conspiracy to falsify records, in violation of 18 U.S.C. § 371. Specifically, Cederquist is charged with conspiring with the Trooper Conspirator to provide false passing scores to five MSP employees (two troopers, including Defendant Rogers, and three civilian MSP employees).

The Trooper Conspirator will testify that he trained the five MSP employees at Fort Devens to prepare them for their CDL skills tests. He will explain that on February 8, 2022, without administering a skills test to any of the five MSP employees, Cederquist stamped the back of their permits and falsely reported on the applications and score sheets that each of the five MSP employees had passed the test. The MSP employees identified in the indictment as Trooper E, Civilian Employee-1, Civilian Employee-2, and Civilian Employee-3 will all testify to the same effect. CSTIMS records and text messages between Cederquist and the Trooper Conspirator will further corroborate their conspiracy.

<u>Count Four – Conspiracy to Commit Extortion</u>

In Count Four, Defendants Cederquist, Butner, and Mendes[8] are charged with conspiracy to commit extortion, in violation of 18 U.S.C. § 1951.  Specifically, Count Four charges those three defendants with conspiring for Cederquist to obtain a stream of benefits from Eric Mathison in exchange for preferential treatment for CDL applicants affiliated with Mathison's employer (identified in the indictment as the Water Company), with Mathison's consent.

To prove this conspiracy, the government will call an applicant identified in the indictment as Water Co. Employee-1, who is expected to testify that Mathison told him that CDL skills tests were always easier for Water Company employees.  This witness will also explain that Defendant Mendes administered his "test," which did not include complete BCS or Road Test portions of the test.  He will testify that after his test, he helped Mathison move cases of premium water from a Water Company truck into Mendes's MSP cruiser.  Special Agent Taber will read text messages sent between Cederquist and Mathison in which they repeatedly discuss various CDL applicants affiliated with the Water Company, joke about their poor performance on the skills test, and list products from the Water Company that Cederquist "needs" and that Mathison delivered to the Stoughton testing site.  Two additional CDL applicants affiliated with the Water Company will testify about their abbreviated skills tests and confirm that they, too, received passing scores.

Applications and text messages will confirm that Mathison regularly served as the sponsor for CDL applicants who worked with him at the Water Company; that he communicated with Cederquist about these applicants in advance of, and sometimes during, their CDL skills

---

[8] Originally charged in Count Four as well, Defendant Eric Mathison entered a guilty plea to this count at a Rule 11 hearing held on March 21, 2025.  Dkt. No. 158.

tests; that he accompanied them to the Stoughton CDL testing site; and that in exchange for preferential treatment on tests from Cederquist, Butner, and Mendes, he regularly delivered products from the Water Company to the Stoughton test site for Cederquist and other members of the MSP CDL Unit, for which neither Cederquist nor anyone at MSP provided payment.

Counts Five-Six – Conspiracy to Commit Extortion

In Counts Five and Six, Defendant Cederquist is charged with conspiracy to commit extortion, in violation of 18 U.S.C. § 1951. Count Five charges Cederquist with conspiring to obtain a stream of benefits from an unindicted co-conspirator (identified in the indictment as the Friend Conspirator) in exchange for Cederquist's help in obtaining CDLs for applicants with whom the Friend Conspirator had personal or business relationships and/or their family members. This stream of benefits included a snowblower and the installation of a new driveway at Cederquist's house. Count Six charges Cederquist with conspiring to obtain a granite post and mailbox from an individual identified in the indictment as the Fence Co. Owner in exchange for Cederquist's help in obtaining a CDL.[9]

With respect to Count Five, the Friend Conspirator will testify about his relationship with Cederquist, the applicants for whom he obtained preferential treatment and false passing scores on skills tests, and the items of value he provided to Cederquist in exchange. Specifically, the Friend Conspirator will explain that on one occasion, he coordinated the installation of a new driveway at Cederquist's house (valued at $10,000 to $12,000) and that, among other things, Cederquist arranged for a CDL to be mailed to the individual identified in the indictment as Applicant-18, who had not – and has never – taken a CDL skills test. On another occasion, the

---

[9] The Friend Conspirator and the Fence Co. Owner will be testifying pursuant to immunity and cooperation agreements.

Friend Conspirator will explain, he procured an $1,800 snowblower for Cederquist from a hardware store, and, in exchange, Cederquist provided a false passing score to the son (Applicant-19) of the hardware store owner, who also paid for part of the snowblower.

The person identified in the indictment as the Asphalt Company Owner is expected to testify that, while coordinating the pickup and delivery of asphalt for Cederquist's new driveway, the Friend Conspirator told him that the CDL for the Asphalt Company Owner's son (Applicant-18) was "all set" and "in the mail," even though Applicant-18 never took a CDL skills test. Additional testimony from other witnesses, including the hardware store owner, CDL applicants, and Applicant-18 will corroborate the Friend Conspirator's recounting. Documentary evidence, including a receipt from the hardware store, text messages between the Friend Conspirator and Cederquist, text messages between the Friend Conspirator and others, CDL applications and score sheets, and CSTIMS records will all provide additional corroboration.

With respect to Count Six, the Fence Co. Owner is expected to testify about his communications with Cederquist and how he arranged for the installation of a $750 granite post and mailbox at Cederquist's house in exchange for preferential treatment on his CDL skills test and, in the end, a passing score – even though he did not perform the vehicle inspection or BCS portions of the test. The Fence Co. Owner's testimony will be corroborated by his contemporaneous text messages with Cederquist (including Cederquist's repeated requests for the mailbox), CDL application and score sheet, and CSTIMS records.

Counts Seven-Nine – Extortion

In Counts Seven through Nine, Defendant Cederquist is charged with substantive extortion, in violation of 18 U.S.C. § 1951, for the acts of extortion described above with respect to Counts Four through Six. Specifically, Count Seven charges the driveway extortion; Count

Eight charges the snowblower extortion; and Count Nine charges the mailbox extortion.

Evidence supporting each substantive extortion count is described above.

Counts Ten-Fifteen – Honest Services Mail Fraud

In Counts Ten through Fifteen, Defendant Cederquist is charged with honest services mail fraud, in violation of 18 U.S.C. §§ 1341 and 1346.  Each of the six counts of honest services mail fraud relates to a particular applicant to whom Cederquist provided a false passing score on their CDL skills test.  The government will prove these counts through testimony from these six applicants, who are identified in the indictment as Water Co. Employee-1, Water Co. Employee-2, Truck Driver, Applicant-18, Fence Co. Owner, and Applicant-19, as well as their applications, score sheets, and CSTIMS test results reports.  Text messages read by Special Agent Taber will corroborate this evidence.  The government expects to prove the mailing dates via certified records from the Massachusetts RMV, via IDEMIA, and, for Water Co. Employee-1, from the New Hampshire DMV.

Counts Sixteen-Forty-Six – Falsification of Records

In Counts Sixteen through Forty-Three, Defendants Cederquist, Butner, and Mendes are charged with falsification of records, in violation of 18 U.S.C. § 1519: Cederquist is charged in Counts Sixteen through Thirty-Four; Butner is charged in Counts Thirty-Five through Forty; and Mendes is charged in Counts Forty-One through Forty-Three.  In Counts Forty-Four through Forty-Six, Defendants Cederquist and Butner are charged with falsification of records, aiding and abetting, in violation of 18 U.S.C. §§ 1519 and 2.  Each falsification of records count relates to a fabricated score on an application, on a score sheet and/or in CSTIMS for a particular applicant, many of whom are referenced above.  Evidence here will variously include testimony as summarized above; CDL applications and score sheets; CSTIMS records; and text messages.

16

<u>Counts Forty-Seven-Seventy-Three – False Statements</u>

In Counts Forty-Seven through Seventy, Defendants Cederquist, Butner, and Mendes are charged with false statements, in violation of 18 U.S.C. § 1001(a)(2): Cederquist is charged in Counts Forty-Seven through Sixty-Three; Butner is charged in Counts Sixty-Four through Sixty-Eight; and Mendes is charged in Counts Sixty-Nine through Seventy.  In Counts Seventy-One through Seventy-Three, Defendants Cederquist and Butner are charged with false statements, aiding and abetting, in violation of 18 U.S.C. §§ 1001(a)(2) and 2.  The false statements counts are essentially the same as the falsification of records counts (same applicants), except that only false entries in CSTIMS are charged.  That is because Section 1001 requires proof of materiality whereas Section 1519 does not.  False statements on applications and score sheets are not necessarily material to the RMV's decision to issue a CDL.  False passing scores entered into CSTIMS, however, are always material because those are the scores on which the RMV relies in making its decisions.

<u>Count Seventy-Four – Perjury</u>

In Count Seventy-Four, Defendant Camara is charged with perjury, in violation of 18 U.S.C. § 1623.  Specifically, the government expects to prove that on May 4, 2023, Camara made material false statements about whether he had filled out the "Sponsor" and "Vehicle Information" sections of Trooper A, B, C, and D's applications during testimony before a federal grand jury.

To prove this charge, the government intends to call Special Agent Taber to introduce the 55-page grand jury transcript and recording into evidence.[10]  The government will seek, with the Court's permission, to circulate copies of the transcript to members of the jury so that they can read along while listening to the recording.  To be clear, the government expects to play only a portion of the recording, which is one hour long, to cover relevant context and the alleged perjury.

## IV.    MOTIONS IN LIMINE

The government has filed the following motions *in limine* with the Court:

- Motion *in Limine* to Preclude Defense Argument for Jury Nullification.  The government moved to preclude the defendants from presenting evidence or argument that may elicit or encourage jury nullification in general, and specifically regarding any potential punishment the defendants may face.  Dkt. No. 114.  None of the defendants has opposed.

- Motion *in Limine* to Limit Content of Defense Opening Statements.  The government moved to preclude the defendants from making an opening statement that covers topics that will not ultimately be proven at trial, including statements relating to the defendants' family upbringing, personal background, motivations, and intent.  Dkt. No. 115.  Defendant Mendes alone filed an opposition, arguing the motion should be denied in part because, without explanation, his personal background will be "central to the evidence at trial."  Dkt. No. 141 at 3.

---

[10] The government is proposing a stipulation to the defendants as to the authenticity and admissibility of the grand jury transcript and recording such that a keeper of the records from the court reporting company will not need to be called.

- Motion *in Limine* to Preclude Evidence of Individuals Not Charged.  The government moved to preclude argument by the defendants with respect to the government's charging decisions in this case.  Dkt. No. 116.  Defendant Camara alone filed an opposition, arguing that immunity agreements of cooperating witnesses should be admissible (the government agrees) and that argument about charging decisions should be permissible (the government disagrees).  Dkt. No. 142.

- Motion *in Limine* to Preclude Reference to Criminal History of Certain Witnesses.  The government moved under seal to preclude the defendants from inquiring of or seeking to impeach government witnesses with evidence relating to prior arrests or criminal convictions.  Dkt. No. 123.  None of the defendants has opposed.

- Motion *in Limine* to Admit Co-Conspirator Statements Under Petrozziello.  The government requested that the Court admit out-of-court statements made by the defendants, as well as by their co-conspirators, pursuant to the protocol established in *United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977).  Dkt. No. 119.  Defendant Camara filed an opposition, suggesting that one communication by the trooper identified in the indictment as Trooper A did not take place "'during' the conspiracy."  Dkt. No. 140.[11]  Defendant Camara in his opposition acknowledged that key statements he seeks to bar were made by Defendant Cederquist.  For the reasons enumerated in the government's opposition to Defendant Camara's motion *in limine* to exclude certain text messages, Dkt. No. 110, including that the statements in question were made *by Defendant Cederquist*, the government submits that the Court

---

[11] Defendant Mendes filed a motion *in limine* ostensibly requesting the same *Petrozziello* protocol requested by the government.  Dkt. No. 143.

should follow the First Circuit's protocol for co-conspirator statements set forth in *Petrozziello*.

- <u>Motion *in Limine* to Preclude Admission or Mention of Certain Text Message</u>.  The government moved under seal to preclude mention of an inflammatory text message sent over a year after the conduct alleged in the indictment concluded by the individual identified in the indictment as the Trooper Conspirator.  Dkt. No. 124. Defendants Mendes and Rogers opposed.  Dkt. Nos. 138-139.  For the reasons set forth in the government's sealed motion, the government requests that the text message in question be precluded from trial.

The defendants have filed the following motions *in limine*:

- <u>Motion *in Limine* to Limit Evidence of Kickbacks to Codefendants</u>.  Defendant Mendes moved for a limiting instruction such that evidence of "benefits/kickbacks/improper payments to his codefendants" not be used against him "unless the Government can put forth evidence of his specific knowledge."  Dkt. No. 104.  Defendant Camara ostensibly joined this motion (or otherwise moved for similar relief).  Dkt. No. 112.  The government assents to an appropriate limiting instruction (though not a wholesale prohibition) with respect to the use of certain evidence relating to bribes, benefits, and/or kickbacks.  Dkt. No. 144.

- <u>Motion *in Limine* to Exclude Certain Testimony</u>.  Defendant Mendes moved to preclude testimony from the Trooper Conspirator "as to what Mendes (or anyone other than himself) understood was meant by the term 'golden'".  Dkt. No. 105.  The government does not oppose this motion but submits that testimony regarding the witness's own understanding of the term "golden" should be allowed.  Dkt. No. 148.

20

- <u>Motion *in Limine* to Exclude Pole Camera Video Footage</u>.  Defendant Butner moved to exclude pole camera video clips depicting CDL skills tests at the Stoughton CDL test site that did not meet the requirements for such tests.  Dkt. No. 107.  For the reasons stated in the government's opposition, this motion should be denied.  Dkt. No. 147.

- <u>Motion *in Limine* to Exclude Witness Opinions on the Defendants' State of Mind</u>.  Defendant Butner moved to "exclude from evidence testimony about the defendants' state of mind."  Dkt. No. 108.  Defendant Mendes moved to join this motion.  Dkt. No. 113.  The government agrees that witnesses should not be permitted to testify about what was going through a defendant's mind but submits that the defendants' broader motion to exclude admissible lay witness testimony should be denied.  Dkt. No. 149.

- <u>Motion *in Limine* to Exclude Lay Witness Opinions that the Defendants' Conduct Was Wrong</u>.  Defendant Butner moved to exclude testimony "that a defendant giving favorable treatment to certain [CDL] test candidates was 'wrong'."  Dkt. No. 109.  Defendant Mendes moved to join this motion.  Dkt. No. 113.  Because the testimony in question meets the requirements of Federal Rules of Evidence 401, 403, and 701, the government submits the defendants' motion should be denied.  Dkt. No. 146.

- <u>Motion *in Limine* to Exclude from Evidence Text Messages Between Defendants Camara & Cederquist Not Dated October 5 or 6, 2021</u>.  Defendant Camara moved to exclude any text messages between himself and Defendant Cederquist before or after the dates of their alleged conspiracy.  Dkt. No. 110.  As noted in the government's opposition, the parties hope to come to an agreement on a narrower set of text

21

messages that will be admissible at trial; to the extent the parties do not reach such an

agreement, the government submits that this motion should be denied.  Dkt. No. 150.

<u>Motion *in Limine* to Exclude Evidence of Scott Camara's Statements on April 25,</u>

<u>2023 & October 11, 2023</u>.  Defendant Camara moved to exclude statements made to

federal agents on April 25, 2023 and during a proffer session on October 11, 2023.

Dkt. No. 111.  The government has no intention of introducing statements made by

Camara on these dates unless they become otherwise admissible (*e.g.*, for

impeachment purposes).  Dkt. No. 145.

## CONCLUSION

This trial brief is meant only as a summary of the evidence that the United States intends

to present at trial and the issues presently known to be in dispute, to the extent it is helpful to the

Court.  It does not describe every witness who will testify at trial, every topic on which witnesses

will testify at trial, or every type of document or material the United States intends to admit at

trial.  The government respectfully reserves the right to call other witnesses and introduce other

documents in its case-in-chief as circumstances necessitate (and as the Court allows).  Should

any legal issues arise that have not been covered in this trial brief, the government respectfully

requests permission to file supplemental briefing.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

Date:  March 31, 2025            By:    */s/ Adam W. Deitch*
                                       Christine Wichers
                                       Adam W. Deitch
                                       Assistant U.S. Attorneys

### <u>CERTIFICATE OF SERVICE</u>

      Undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.


                      */s/ Adam W. Deitch*
                      Adam W. Deitch
                      Assistant United States Attorney

Dated:  March 31, 2025