UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CALVIN BUTNER,<br><br>                Defendant. | Case No. 24-cr-10024-IT-2 |

## GOVERNMENT'S SENTENCING MEMORANDUM

For years, Trooper Calvin Butner betrayed his State Police badge to dole out favors to friends and family members, all the while jeopardizing the safety of anyone on the roads and highways of Massachusetts and beyond. He did this by himself, for people he knew from various aspects of life, and he did it in cooperation with others, conspiring with his MSP brethren to ensure that anyone connected to members of the "CDL Unit" in Stoughton could get their license to drive tractor-trailer trucks, oil tankers, and school buses without passing a real road skills test – or, in some cases, without ever taking a skills test at all.

For the reasons set forth below and to be articulated at the sentencing hearing scheduled for August 12, 2025, the government respectfully submits that a sentence of fifteen months of incarceration, one year of supervised release, and the mandatory special assessment of $900 is appropriate in this case and for this defendant. Such a sentence would be sufficient, but not greater than necessary, to satisfy the sentencing objectives enumerated in 18 U.S.C. § 3553(a).

## FACTUAL BACKGROUND

Calvin Butner started his career with the Metropolitan District Commission Police ("MDC") in 1983. PSR ¶ 21(b). In 1992, when MDC merged to form the Department of State Police, Butner became a trooper in the Massachusetts State Police ("MSP"). *Id*. In 2015, Butner transferred into the CDL Unit, where he served primarily at the Stoughton CDL testing site until his transfer to MSP's Supply Section in early 2023. *Id*. He retired shortly thereafter and was dishonorably discharged. *Id*.

In his role in the CDL Unit, Butner was tasked with administering the three-part CDL skills test, which included a pre-trip inspection, the Basic Control Skills or "maneuvers" portion, and a road test.[1] PSR ¶ 15. Butner was required to administer and score each portion of the test for each CDL applicant and – only if the applicant passed all three portions of the test – stamp the applicant's CDL permit and enter the applicant's truthful scores into a computer database called "CSTIMS." *See id*.

As the Court is well aware, the CDL road skills test is designed and approved by the Federal Motor Carrier Safety Administration and the American Association of Motor Vehicle Administrators. PSR ¶ 10. And it is challenging by design to ensure that only qualified drivers receive licenses to drive heavy and dangerous trucks on the road. Indeed, the overall pass rate for tests administered by the defendants and conspirators in this case was just 33%.[2] PSR ¶ 26. The vehicle inspection test involves identifying and explaining dozens of parts and functions of a

---

[1] For a more detailed background on CDL testing and MSP's CDL Unit, the government adopts and refers the Court to Paragraphs 10 through 22 of the Presentence Investigation Report ("PSR").

[2] During the conspiracy, Trooper Butner's pass rate was 34%.*

2

Class A or Class B vehicle. PSR ¶ 15(a). The Basic Control Skills section requires the driver to successfully complete a series of difficult maneuvers in the vehicle. PSR ¶ 15(b). And, finally, the road test involves the applicant driving the truck on the road – with the trooper-examiner in the passenger seat – for approximately 25 minutes and with very specific requirements. PSR ¶15(c).

Over a three-year period, from at least as early as May 15, 2019 until January 5, 2023, Trooper Butner conspired with Sergeant Gary Cederquist, Trooper Perry Mendes, Trooper Joel Rogers, and Trooper Matthew Davis to provide false passing scores to CDL applicants connected to Butner and other members of the CDL Unit. PSR ¶ 25. Together, they agreed that certain applicants – whom they called "goldens" – would receive guaranteed passing scores on their CDL skills test even if they took an incomplete test, took and actually failed the test, or, in some cases, never took the test at all. PSR ¶¶ 25-26. Indeed, all of the applicants deemed "goldens" by Butner and his co-conspirators received passing scores on the test. PSR ¶ 26.

For example, five applicants to whom Butner gave the "golden handshake" were Keith Betts, Tristan Randolph, Paul Damon, Ruben Laroche, and Clarence Rowell[3]:

- **Keith Betts** – On May 17, 2021, Betts – a childhood friend of Butner's – arrived at the Stoughton testing site to take his CDL road skills test with Butner. After Betts gave Butner his application and learner's permit, Butner stamped the permit and told Betts he had passed the test. Butner then wrote on the application that Betts had taken and passed all parts of the test and fabricated from whole cloth specific scores and markings on Betts's scoresheet. Butner also accessed CSTIMS and falsely

---

[3] The names of these applicants were introduced during Sergeant Cederquist's trial, either because they testified or otherwise. *See, e.g.*, Ex. 263 (summary chart identifying applicants by name).

reported that he had administered a skills test to Betts, indicating that Betts had driven a Class A vehicle with air brakes and had passed all portions of the test. Thereafter, Betts received a Class A CDL in the mail. In reality, Betts never took a CDL skills test. PSR ¶ 60.

- **Tristan Randolph** – Randolph, whose father was a Brockton police officer, likewise received a CDL without ever taking the test. On December 10, 2019, Butner accessed CSTIMS and falsely reported that he had administered a skills test to Randolph, indicating Randolph had driven a Class B vehicle and had passed all portions of the test. Thereafter, Randolph received a Class B CDL in the mail. In reality, Randolph never took a CDL skills test and in fact never even had to go to a CDL testing site. PSR ¶ 61. As Randolph testified at Sergeant Cederquist's trial, he proceeded to drive CDL vehicles in the course of his job for the City of Brockton.

- **Paul Damon** – Damon, who worked at a fence company at which Butner was a customer, exchanged text messages with Butner regarding a CDL skills test, and Butner provided Damon with a date for Damon to go to the Stoughton testing site for his "test." When Damon showed up in Stoughton, Butner asked Damon if he knew how to drive a truck with air brakes. When Damon said "yes," Butner replied that Damon had passed the "test." On April 30, 2021, Butner accessed CSTIMS and falsely reported that he had administered a skills test to Damon, indicating that Damon had driven a Class B vehicle with air brakes and had passed all portions of the test. Thereafter, Damon received a Class B CDL in the mail. In reality, Damon never took a CDL skills test with Butner. PSR ¶ 63.

4

- **Ruben Laroche** – Laroche, connected to Butner through a mutual acquaintance, also got a CDL from Butner without taking a test. When the acquaintance asked Butner for a favor, Butner went ahead and stamped Laroche's CDL learner's permit as if he had taken and passed a Class B skills test. On August 2, 2018, Butner accessed CSTIMS and falsely reported that he had administered a skills test to Laroche, indicating that Laroche had driven a Class B vehicle and had passed all portions of the test. Thereafter, Laroche received a Class B CDL in the mail. PSR ¶ 65.
- **Clarence Rowell** – Rowell, connected to Butner through the same mutual acquaintance as Laroche, likewise got his CDL through Butner without ever showing up for or taking a test. The acquaintance provided Butner with Rowell's blank learner's permit, and Butner stamped it as if Rowell had taken and passed all portions of a Class A CDL skills test. On February 12, 2019, Butner then accessed CSTIMS and falsely reported that he had administered a skills test to Rowell, indicating that Rowell had driven a Class A vehicle and had passed all portions of the test. Thereafter, Rowell received a Class A CDL in the mail. PSR ¶ 66.

These examples, and Butner's affirmative participation in the "golden" conspiracy, were not random or isolated incidents. The balance of the evidence, much of which was introduced during Sergeant Cederquist's trial, demonstrates that golden handshakes were a regular part of doing business for MSP's CDL Unit in Stoughton.

**PROCEDURAL BACKGROUND**

On January 21, 2024, a grand jury returned a 74-count indictment against six defendants, including Butner. Butner was charged in Count 1, along with Sergeant Cederquist, Trooper Mendes, and Trooper Rogers, with conspiracy to falsify records (the "golden conspiracy"), in

violation of 18 U.S.C. § 371; Count 4, conspiracy to commit extortion, in violation of 18 U.S.C. § 1951; Counts 35-40, with falsification of records, in violation of 18 U.S.C. § 1519; Counts 44-46, with falsification of records, aiding and abetting, in violation of 18 U.S.C. §§ 1519 and 2; Counts 64-68, with false statements, in violation of 18 U.S.C. § 1001(a)(2); and Counts 71-73, with false statements, aiding and abetting, in violation of 18 U.S.C. §§ 1001(a)(2) and 2.

On April 7, 2025, the Court held a Rule 11 hearing at which Butner admitted to his role in the "golden conspiracy," pleading guilty to Counts 1, 44-46, and 65-68 of the indictment.[4] Several other defendants entered guilty pleas, including Trooper Mendes on April 11, 2025, and Sergeant Cederquist alone proceeded to trial on April 14, 2025. On May 2, 2025, the jury returned a guilty verdict on 48 of the 57 counts with which Cederquist was charged, including as to the "golden conspiracy."

## DISCUSSION

### I. Sentencing Guidelines Calculation

As a preliminary matter, the government concurs with the defendant's offense level, criminal history, and Guidelines Sentencing Range ("GSR") as calculated by the U.S. Probation Office ("Probation") and detailed in the Presentence Investigation Report ("PSR") in this case. Specifically, the government agrees with Probation's assessment of the base offense level (14), pursuant to USSG § 2J1.2(a); the specific offense characteristic calling for a two-level increase because the offense in question was extensive in its scope, planning, preparation, and execution, pursuant to USSG § 2J1.2(b)(3); and the specific offense characteristic calling for a two-level

---

[4] The government has agreed to request dismissal of the remaining counts against Butner upon imposition of his sentence.

increase because the defendant abused a position of public trust that significantly facilitated the commission and concealment of the offense, pursuant to USSG § 3B1.3. PSR ¶¶ 74-77.

As calculated by Probation, the defendant's Total Offense Level is 13 and his Criminal History Category ("CHC") is I, resulting in a GSR of 12-18 months. PSR ¶¶ 84, 88-89, 132. In addition, Probation has computed the Guidelines range for supervised release to be one to three years and the range for a fine to be from $5,500 to $55,000, in addition to a mandatory special assessment of $900. PSR ¶¶ 136, 141-42.

The defendant's objection to the application of the two-level increase pursuant to USSG § 2J1.2(b)(3) lacks merit. The government agrees with Probation and submits that this section of the Guidelines is designed for precisely the conduct described in Count 1 of the indictment. Section 2J1.2(b)(3) of the Guidelines states, "If the offense (A) involved the destruction, alteration, or fabrication of a substantial number of records, documents, or tangible objects; (B) involved the selection of any essential or especially probative record, document, or tangible object, to destroy or alter; or (C) was otherwise extensive in scope, planning, or preparation, increase by 2 levels." USSG § 2J1.2(b)(3) (emphasis added). Subsection (C) applies here because the offense in question in Count 1 – the "golden conspiracy" – was demonstrably extensive in scope, planning, participation, and execution.

Significantly, this USSG section addresses *the offense* – not *the defendant's role in the offense*. Addressing the same subsection of the Guidelines, a judge in the Eastern District of New York recently held that the Court is "not confined to considering only the individual acts committed by [the defendant] because this enhancement applies "'[i]f the offense … was … extensive in scope, planning, or preparation.' USSG § 2J1.2(b)(3)(C) (emphasis added). Thus, I look to all the relevant conduct of [the defendant] and his co-conspirators during this years-long

conspiracy." *United States v. McPartland*, No. 17-CR-587 (JMA), 2021 WL 3409229, at *14 (E.D.N.Y. Aug. 4, 2021). In the end, the district court explained, "The obstructive conduct of Defendants and their co-conspirators—the latter of which was all 'within the scope of jointly undertaken criminal activity,' 'in furtherance of that criminal activity,' and 'reasonably foreseeable in connection with that criminal activity'—was, collectively, extensive in scope, planning, and preparation." *Id*.

Here, there can be no question that the agreement described in Count 1 between Cederquist, Mendes, Butner, Rogers, and Davis to give guaranteed passing scores to favored CDL applicants was extensive in scope, planning, and preparation. The conspiracy lasted no less than three and a half years. During that time, the conspirators had to plan and work together, both to effectuate the scheme and to keep it a secret. Together, they made sure that favored applicants were scheduled to be tested where they worked in Stoughton and that a trooper who was a member of the conspiracy, as opposed to an innocent (honest) road test examiner, was assigned to test "golden" applicants. The scheme involved managing the test scheduling system, ferrying golden applicants into and out of Stoughton without their partial or nonexistent tests raising suspicion, entering fraudulent scores on the back end, and concealing any records relating to the crime.

In addition, and despite any suggestion by the defendant(s), there were more than just a handful of golden applicants. The seventeen applicants identified in paragraphs 47-63 of the indictment and in the summary chart admitted at Sergeant Cederquist's trial (Exh. 263) represent only those examples the government was able to identify from text messages in Cederquist's iCloud account. Inevitably, there were more – perhaps far more – applicants who received the benefit of the defendants' scheme; for example, there are other "goldens" referenced in

Cederquist's texts without sufficient information to identify them by name. Testimony at trial by Davis and Rogers confirmed there were many more such applicants. Davis talked about "frustration that [Cederquist] would *keep asking* [Mendes] for golden handshakes for applicants that he had on his schedule," and that Butner "seemed agitated or frustrated that Gary Cederquist was asking for goldens for his applicant*s*".

Rogers testified that he first heard the word "golden" from Butner when, one day, Butner mentioned that "he had one of Gary's goldens coming in," which meant "when one of Gary's friends comes in and he wants to, you know, make sure they pass." The testimony from Davis and Rogers, including the statements Butner made to them, indicate that requests for golden treatment were neither unusual nor infrequent. And, as discussed above, Butner's personal role in the conspiracy was far from a "one-off." For these reasons, the government agrees with Probation and submits that the two-level enhancement under USSG § 2J1.2(b)(3)(C) applies.

## II.     Sentencing Recommendation

The government's recommended sentence – specifically 15 months of incarceration – is the reasonable and just outcome in a case where the defendant, a member of the State Police entrusted to uphold the laws of the Commonwealth, conspired with a cadre of fellow troopers to perpetrate a fraud on the public that, inarguably, put everyone on the roads and highways of Massachusetts at risk. And not only did he do this, month after month, but he joked about it by text message with his co-conspirators, took measures to carefully conceal the conduct, and did not stop until he got caught. In short, a meaningful sentence of incarceration – indeed, a sentence in the middle of the Guidelines – would accomplish the goals of Section 3553(a) and would be no longer than necessary to do so.

9

Pursuant to 18 U.S.C. § 3553(a), the Court is required to consider a series of factors when determining an appropriate sentence. These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant"; the four legitimate purposes of sentencing; "the kinds of sentences available"; the Guidelines range itself; any relevant policy statements by the Sentencing Commission; "the need to avoid unwarranted sentence disparities among defendants"; and "the need to provide restitution to any victims."  18 U.S.C. § 3553(a).

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  Section 3553(a) also mandates that the sentence reflect the seriousness of the offense to, among other things, promote respect for the law, provide just punishment, adequately deter criminal conduct, and protect the public from further crimes of the defendant.  Taken together, the considerations enumerated in Section 3553(a) – in particular, the nature and seriousness of the offenses of conviction, the need to promote respect for the law and impose just punishment, and the importance of general deterrence – weigh in favor of a sentence that includes a meaningful period of incarceration.

**A. The Nature and Circumstances of the Offense Warrant a Sentence of 24 Months**

First, the Court must consider the nature, circumstances, and seriousness of the offense, combined with the need for a sentence to promote respect for the law and provide just punishment.  18 U.S.C. §§ 3553(a)(1) and 3553(a)(2)(A).  Here, in light of the scope, the substance, and the manner in which Butner conducted himself, the government submits that the nature, circumstances, and seriousness of the offense warrant a sentence of 15 months of incarceration.

As a threshold matter, Trooper Butner held a position of indisputable public trust and was expected to hold himself to a standard of honesty and moral certitude as a member of the Massachusetts State Police. Unlike roles in the private sector, Trooper Butner held a position requiring a rightfully elevated level of integrity. By engaging and playing an active role in a years-long conspiracy to give guaranteed and fraudulent passing scores to CDL applicants, Trooper Butner utterly failed to uphold the values required for his position and violated the public's trust. At bottom, the nature and circumstances of Butner's conduct speaks for itself: he actively participated in a years-long scheme to give people connected to him – his own friends and acquaintances, as well as the friends and acquaintances of other members of the MSP CDL Unit – false passing scores when they did not take complete CDL skills tests, failed the test, or never took the test at all. The core dishonesty demonstrated by Trooper Butner, a sworn member of the Massachusetts State Police who held himself out as an upstanding law enforcement officer, is outrageous and inexcusable.

Perhaps even more significantly, Trooper Butner's conduct, and that of his trooper co-conspirators, had an obvious and deleterious effect on public safety in Massachusetts and beyond. As the Court is aware, fraudulent passing scores meant that applicants who never proved they were qualified and capable of operating huge commercial vehicles received their Class A and Class B CDLs – and then could drive those vehicles on the roads and highways here and, as their CDLs allowed them to, across the United States if they so chose. And as testimony from Troopers Davis and Rogers at Sergeant Cederquist's trial demonstrated, no one understood the grave risks posed by large commercial vehicles better than the members of the CDL Unit themselves. In other words, Trooper Butner knew the dangers posed by allowing unqualified

11

drivers behind the wheel, and he made sure his friends got their CDLs without taking or passing the test regardless.

Finally, Trooper Butner joked around when giving golden treatment to applicants who literally could not drive a commercial truck. Regarding one applicant described by Sergeant Cederquist as the friend "of a Trooper friend of mine," Butner – who administered the "test" for this applicant – texted Cederquist, "This guys a mess." and "Lol. He owes u a prime rib 6inch." Butner proceeded to give this applicant a passing score, both on his scoresheet and in CSTIMS, and on March 13, 2020 the applicant was issued a Class B CDL.

To be sure, the government acknowledges that no defendant in this case is as culpable as Sergeant Cederquist: Cederquist ran the CDL Unit in Stoughton, supervised every other participant in the golden conspiracy, and engaged in a series of additional bribery and extortion schemes. To that end, the government expects its sentencing recommendations for Sergeant Cederquist and the various other defendants in this case to reflect exactly that. However, the conduct of participants in the golden conspiracy like Butner demonstrates a blatant disregard for the law and, more egregiously, a callous indifference for the safety of everyone on the roads and highways of Massachusetts. Butner's years-long, repetitive conduct warrants the fifteen-month sentence the government requests.

### B. General Deterrence Mandates a Significant Sentence

Pursuant to 18 U.S.C. § 3553(a)(2)(B), the Court also must consider the need for the sentence to afford adequate general and/or specific deterrence to criminal conduct. Here, the government submits that the Court should be particularly concerned with general deterrence. Butner's conduct, combined with the evidence introduced throughout Sergeant Cederquist's trial, demonstrates the lengths certain members of law enforcement are willing to go to provide

benefits only to people with the "right" connections. In many instances in this case, the corrupt conduct seemed to originate exclusively because of personal or professional relationships with Butner, Cederquist, or another member of the CDL Unit.

Particularly given the specter of recent police corruption scandals in Massachusetts, the conduct exposed in this case underscores the need for this Court to impose a sentence that takes general deterrence into account and sends a message that this type of criminal conduct by members of law enforcement will not be tolerated. A sentence that includes a meaningful period of incarceration is necessary to deter others similarly situated to Trooper Butner – that is, members of MSP and other members of law enforcement – who might be tempted to engage in a similar course of conduct. A sentence without a serious period of incarceration would not accomplish this goal. The government submits that a sentence of fifteen months of imprisonment for this defendant will serve to generally deter others from contemplating or engaging in such crimes.

### C. Butner's History and Characteristics

Butner's history and characteristics also weigh in favor of a longer incarcerative sentence. *See* 18 U.S.C. § 3553(a)(1). Butner has had more advantages than most defendants who appear before this Court. As Probation notes in the PSR, Butner grew up in an upper-middle-class neighborhood, had (and has) a loving and supportive family, has always had his basic needs met, and did not experience traumatic events during his upbringing. *See* PSR ¶¶ 103-04. As discussed above, for nearly forty years, Butner also had the benefit of a steady, well-paying job in law enforcement.

Unlike many of the defendants who appear before this Court, Butner has not struggled with poverty, addiction, or a lack of opportunity. To be clear, while these challenges do not

13

excuse criminal behavior, they sometimes provide context for criminal conduct. That is not the case here. There are no such mitigating factors in this case, and the defendant should be sentenced accordingly.

### D. Proportionality

In recent police corruption cases brought in this district, defendants have received a range of sentences, generally commensurate with factors like whether and when they took responsibility for their conduct, whether they cooperated with law enforcement, whether they testified as a part of their cooperation, and – significantly, of course – the nature of the conduct itself. To the extent it is helpful to the Court, particularly if Trooper Butner attempts to cherry-pick certain of these sentences in his own arguments here, the government has attached as an exhibit a chart of comparative cases, with case citations, crimes charged, GSRs, and sentences imposed. *See* Exh. A. This chart also includes a column describing factors that distinguish those cases from the instant case, of which there are plenty.

Here, Butner's conduct is easily distinguishable from those law enforcement defendants who received time serviced or probation-only sentences. In particular, and as discussed above, Butner's conduct is directly and inextricably linked to potentially dire public safety consequences. Indeed, even compared to overtime fraud cases involving officers who did not show up to assigned public safety-related shifts or left shifts early, the criminal behavior here is in many ways more egregious: Butner's conduct put drivers behind the wheels of commercial vehicles when they never demonstrated they were capable of driving them (or, worse, demonstrated the opposite).

Finally, with respect to proportionality, the government acknowledges that it is recommending fifteen months for Trooper Butner, and twelve months for Trooper Mendes. The

government submits that Trooper Butner's conduct warrants, proportionally, a more serious penalty than that of Trooper Mendes, if only by a margin. First, the government was able to identify several more specific examples of applicants to whom Butner gave guaranteed and fraudulent passing scores, including more examples of applicants who received CDLs without even showing up to Stoughton for the test. And, second, the evidence of Butner's text messages provides unique insight into how casually he communicated about what, in the government's view, was deeply troubling and dangerous criminal conduct.

## CONCLUSION

For all of the foregoing reasons, the government respectfully recommends that the Court impose a sentence of fifteen months of imprisonment, one year of supervised release, and the mandatory special assessment of $900. Such a sentence would be sufficient, but not greater than necessary, to reflect the seriousness of the offense and the goals of sentencing.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

Date: August 6, 2025        By:    /s/ *Adam W. Deitch*
                                   CHRISTINE WICHERS
                                   ADAM W. DEITCH
                                   Assistant U.S. Attorneys

15

**CERTIFICATE OF SERVICE**

      Undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                      */s/ Adam W. Deitch*
                                      Adam W. Deitch
                                      Assistant United States Attorney

Dated: August 6, 2025