UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | Crim. No. 24-CR-10024-IT |
| CALVIN BUTNER,<br>　　　　Defendant | ) ) ) ) | |

## Defendant Calvin Butner's Sentencing Memorandum

The offenses to which Calvin Butner has pled guilty are serious ones. As a Massachusetts State Police Trooper and authorized CDL tester, he had a duty to the public to insure that only those candidates who demonstrated their ability to safely operate commercial trucks would receive their CDL license. In granting licenses to individuals who, in fact, failed their CDL test or did not even take a test, he betrayed the public's trust and endangered public safety. Calvin Butner recognizes the seriousness of his conduct. He has accepted full responsibility for his actions.

To be sure, there are persuasive arguments in favor of imposing a jail sentence in this case. In particular, the considerations of promoting respect for the law, affording just punishment and deterring others from engaging in similar conduct arguably weigh in favor of a jail sentence. Respectfully, Calvin Butner submits that a jail sentence is not necessary to fairly account for those considerations and Mr. Butner's personal circumstances, as well as other sentencing considerations, weigh in favor of a non-jail sentence. Accordingly, the imposition of a jail sentence in this case would be greater than necessary to achieve the purposes of §3553(a).

1

Calvin Butner respectfully submits that a sentence of time served (one day) followed by one year of supervised release, with a condition that he serve a six-month term of home confinement, is fair and just under the circumstances of this case. Imposing a probationary, non-jail sentence in this matter is appropriate for the following reasons: 1) it would fairly balance the various sentencing factors set forth in 18 U.S.C. § 3553; 2) it would represent a small variance from the guideline sentencing range of 6-12 months; 3) it would be consistent with other sentences imposed against Massachusetts State Troopers and Boston Police officers in this district in comparable cases; 4) it would be consistent with sentences imposed in the Brockton RMV case, which involved similar conduct; and 5) it would be consistent with sentences imposed nationally in cases under U.S.S.G. § 2J1.2.

**Background**

Calvin Butner was a Massachusetts State Trooper from December 1983 until his retirement in March 2023. PSR, ¶126. He is 64 years old and suffers from high blood pressure and arthritis. PSR, ¶116. Raised in Brockton by his father and step-mother, Calvin was the oldest of three siblings. PSR, ¶¶101-106. Mr. Butner has two biological children and raised two step-daughters together with his wife Maria. PSR, ¶¶107-111. Maria reports that she was previously in an abusive relationship and went from "feeling hopeless to feeling valued" upon meeting Mr. Butner. PSR, ¶114. Maria also described her husband as "always showing her respect, compassion, being an inspiration and a good caretaker" but worries about the impact imprisonment would have on his mental and emotional health. *Id.* Mrs. Butner is also concerned that she would have to sell their home if Mr. Butner is sentenced to jail and she would be forced to move in with her daughter due to her disability. *Id.*

Mr. Butner's family, friends and colleagues all describe Calvin as a selfless man of great integrity, character and humility, who is dedicated to his family, his church, his community and serving those less fortunate. His stepdaughter describes Calvin as her "rock, my safe place, and my example of what it means to lead with honor. . . He is kind without expectation, patient without limit, and endlessly generous with his time, his energy, and his heart. For anyone in need-family, friend, or stranger-my father is the person who answers the call, no matter the cost. Exhibit A at 3. A Pastor of Mr. Butner's church describes Mr. Butner as having the characteristics of a servant:

> He feeds the hungry, mentors the men that are younger than he is, and he is loyal to his wife and his church. . . he loves the work of being a deacon which means helping with the church (he cleans the church, but no one would know it because he does not mention it). If a sister within the church need help, he is quick to assist (be it changing tires and helping them to move).

Exhibit A at 8. Another pastor of Mr. Butner's church describes him in a similar vein:

> Calvin has consistently demonstrated leadership and a deep care for others. One of the most impactful examples of this is the way he organized a group of men to serve meals to the homeless at the MainSpring House in Brockton. He has done this faithfully for as long as I can remember, never seeking recognition, but always showing up to meet the needs of others.
>
> He is someone we can all count on for an honest answer, even when it's difficult to hear. His commitment to truth and service is a rare and admirable quality. Calvin has a heart for people and a genuine desire to help those in need. His life has been one of service-to his family, his church, and the broader community.
>
> As a pastor with nearly 30 years of ministry experience, I can say without hesitation that this current situation is the most difficult challenge I have seen Calvin face. He has accepted responsibility for his actions, and I know he carries the weight of his mistake with great humility.

Exhibit A at 9.

**Argument**

A. **The Sentencing Guidelines**

The defendant, government and probation are in agreement on all Sentencing Guidelines calculations, with one exception: the government and probation argue that a 2-level enhancement applies under U.S.S.G. § 2J1.2(b)(3)(C) because the offense was extensive in scope, planning, or preparation.[1] The defendant has objected to the enhancement because the evidence does not support such a finding. Accordingly, Mr. Butner's GSR is properly calculated at 8-14 months.

To the extent the government's argument in support of this enhancement relies, in spart, on "relevant conduct" by Mr. Butner's co-conspirators, the First Circuit has recently reaffirmed that sentencing based on relevant conduct has "an important qualifier: '[T]he scope of the jointly undertaken criminal activity is not necessarily the same as the scope of the entire conspiracy.'" *United States v. Guia-Sendeme*, 134 F.4th 611, 619 (quoting U.S.S.G. § 1B1.3, cmt. n.3(B)). Rather, "[i]n order to determine the defendant's accountability for the conduct of others . . . , the court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake . . . . [T]he accountability of the defendant for the acts of others is limited by the scope of his or her agreement to jointly undertake the particular criminal activity. Acts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct . . . ." § 1B1.3, cmt. n.3(B).

---

[1] The government does not contend that either of the other two subsections of § 2J1.2(b)(3) apply.

Here, the government cites no facts supporting a finding by a preponderance of the evidence that the scope of Mr. Butner's "jointly undertaken criminal activity" includes all applicants provided preferential treatment over the course of the approximately three-and-a-half year conspiracy. To the contrary, the PSR breaks the Offense Conduct into several discrete "conspiracies." Paragraphs 29-41 discuss a "conspiracy between Cederquist and Camara to falsify CDL test result records for four members of MSP's 'Truck Team,'" paragraphs 42-44 describe a "conspiracy between Cederquist and Trooper Davis to falsify CDL test result records for five MSP employees at Fort Devens," and paragraphs 45-48 are devoted to a "conspiracy between Cederquist, Mathison, and Dan Leone to Extort Belmont Springs Inventory." (Capitalization omitted). Based on the Offense Conduct, Gary Cederquist was at the center of the various conspiracies and was responsible for directing the actions of the various co-conspirators. While the participants in the various conspiracies may have been aware that others were engaged in similar conduct, the evidence does not demonstrate a necessary "agreement" among them or jointly undertaken criminal activity.

Ultimately, it is the government's position that Mr. Butner agreed to give passing scores to at least five applicants who actually failed the test, to give passing scores to at least another six applicants who may or may not have failed the test, and gave passing scores to at least five applicants who never took the test. Government Response to Defendant Butner's Objection.

The defense respectfully submits that the false reporting of ten test scores over several years (out of thousands of administered tests), Mr. Butner's agreement to pass another six who may or may not have failed the tests and his knowledge that co-conspirator Mendes was passing a small number of favored candidates at the request of Cederquist, is not sufficiently "extensive in scope, planning, or preparation" to warrant the 2-level enhancement. Indeed, the

5

PSR does not mention any "planning" or "preparation" whatsoever undertaken by Mr. Butner and the mere temporal duration of the conduct cannot support the enhancement because "the duration of the offense is not equivalent to its 'scope' for purposes of § 2J1.2(b)(3)(C)." *United States v. Newman*, 614 F.3d 1232, 1239 (11th Cir. 2010). Similarly, virtually every obstruction case requires some level of planning and coordination. Accordingly, the mere involvement of multiple participants or steps to accomplish the defendants' goal cannot alone be sufficient to support the enhancement.

Mr. Butner's jointly undertaken offense conduct with Mendes and Cederquist was unquestionably serious, but it simply was not extensive in planning, scope or preparation. It was not an elaborate or sophisticated plan. The planning and preparation involved in the offense was minimal and quite simple: Calvin Butner's boss, Gary Cederquist, scheduled favored applicants for tests at the Stoughton testing facility that Cederquist supervised and where Butner and Mendes worked. Cederquist then advised Butner or Mendes, whose job it was to test numerous candidates each day, that a particular candidate was to receive favorable ("golden") treatment. Butner and Mendes then gave favorable treatment to the identified candidates by administering watered-down tests or giving passing grades to test-takers who, in fact, failed. This simple and unsophisticated plan was not extensive in planning, scope or preparation.

To be clear, Calvin Butner is not attempting to minimize his conduct or his role in the offense, but the scope of his jointly undertaken criminal pales in comparison to that which has been held sufficient to support the enhancement. *See United States v. Reed*, 75 F.4th 396, 399 & 406 (4th Cir. 2023) (defendant convicted of "an elaborate ploy to intimidate an [IRS] agent into halting her efforts to collect his delinquent tax debt," including "efforts to convince

[defendant's employer] not to garnish his wages, his numerous frivolous legal filings in multiple States, and his campaign of serving notarized documents on [the agent] purporting to show she personally wronged him and owed him millions of dollars" (citation omitted)); *United States v. Wilkins*, No. 20-14798, 2022 WL 98748, at *7 (11th Cir. 2022) (unpublished) (defendant's "campaign to prevent [a witness] from cooperating was multi-faceted and lasted more than seven months. He used different media to communicate with [the witness], sometimes disguising his identity to evade detection by authorities. Plus, his comments to [the witness] reflect that he was extensively 'plotting' while in jail and had engaged his 'people,' including his sister, to keep tabs on [the witness]"); *United States v. Pegg*, 812 F. App'x 851, 860 (11th Cir. 2020) (defendant convicted of obstruction in connection with efforts to obtain a Rule 35 sentence reduction where defendant "coordinated the scheme in secret from prison, directing several people through numerous coded phone calls and e-mails. [Defendant] established a 'cover-up' story that [third-party] payments were for roofing or other expenses to further conceal the payments from investigators. Off and on for at least four years, [defendant] and his associates were involved in planning and preparing for a Rule 35 motion").

For the foregoing reasons, a 2-level enhancement under U.S.S.G. § 2J1.2(b)(3)(C) is not supported by the evidence of Calvin Butner's jointly undertaken criminal activity.

### B. Mr. Butner's Family Circumstances

Under the facts presented in this case, Mr. Butner's family circumstances—specifically his role as caregiver to his disabled wife and sole responsibility for the household's finances—would not justify a guidelines sentencing departure because Maria could move in with her daughter if Mr. Butner is sentenced to prison. *See*, U.S.S.G. §5H1.6, Commentary, Application Note 1(B)(i)-(iv). However, under the less stringent post-*Booker* and -*Gall* analysis, where the

7

ultimate evaluation of a court's sentencing decision is one of reasonableness, policy statements are not decisive as to what may constitute a permissible ground for a variant sentence in a given case and a district court may take idiosyncratic family circumstances into account. *See United States v. Martin*, 520 F.3d 87, 93 (1st Cir. 2008). Under this approach, Mr. Butner's role as the caretaker to his wife would indeed warrant the small variance being requested. *See United States v. Roselli*, 366 F.3d 58, 68–70 (1st Cir. 2004) (affirming pre-Booker sentencing departure from 12-month guideline sentence to home confinement where defendant had four children, two of whom had cystic fibrosis and required constant care and other parent was battling her own debilitating health problems); *United States v. Jaber*, 362 F. Supp. 2d 365, 383 (D. Mass. 2005) (imposing sentence of two years' probation, with home confinement for six months, where defendant's wife "was hospitalized and dysfunctional" requiring him to "effectively tak[e] over the care of four young children"); *United States v. Martin*, 520 F.3d 87, 93 (1st Cir. 2008) (affirming 91-month variance due in part to the support the defendant stood to receive from his family [and] defendant's potential for rehabilitation; post-*Booker* policy statements are not decisive as to what may constitute a permissible ground for a variant sentence in a given case); *United States v. Prosperi*, 686 F.3d 32, 48 (1st Cir. 2012) (the circumstances of the defendant's family were "atypical and powerful, both in justifying a variance [from the 87-108 GSR] and in the [six-month period of] home confinement actually chosen," where defendant's wife was battling terminal cancer).

C. **Deterrence and Promoting Respect for the Law**

A sentence of imprisonment is simply unnecessary to specifically deter Mr. Butner from committing a future crime because of his age, the impact his prosecution has had on his wife and family, and the public humiliation he has suffered as the target of a high-profile federal

prosecution. In light of these facts, the likelihood of Mr. Butner re-offending is near zero. The defendant anticipates the government's primary basis for recommending a jail sentence will be the need to promote respect for the law and deter others from committing similar crimes. Such arguments are understandable but a felony conviction, which will result in the collateral consequence of Mr. Butner forfeiting his pension, is itself a severe penalty under the circumstances of this case. In addition, Mr. Butner will continue to suffer the public humiliation, personal embarrassment and stress he has endured throughout the prosecution of this matter. In pursuing fraud prosecutions against police officers, with accompanying arrests and extensive media coverage, the government achieves its intended effect of promoting respect for the law and deterring others from committing similar offenses. Indeed, to the extent the government seeks to deter similar conduct, its message was sent loud and clear when local news stations covered the initial arrests and court appearances of the defendants in this case. An accompanying jail sentence will do little to enhance the deterrence and respect for the law already achieved by the government's vigorous enforcement of the law against State Troopers in this case. Moreover, home confinement and a term of supervised release are meaningful punishments. *See, e.g., United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012) (affirming sentences of six months home confinement and 3 years' probation despite $5.2 million loss and GSR of 87-108 months). As Judge Stearns noted and the First Circuit quoted with approval in *Prosperi*:

> I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person . . . who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong they have committed.

*Id.* at 43-44.

### D. The Need to Avoid an Unwarranted Sentencing Disparity

Section 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." As the government's own case comparison chart[2] demonstrates, of fourteen Boston Police officers and Massachusetts State Troopers who pled guilty to overtime fraud offenses with similar GSR's to Mr. Butner's, only two—Raftery (number 21 on the chart, sentenced to 3 months) and Sweeney (number 26 on the chart, sentenced to 60 days)—were sentenced to more than 1 day in jail. The remining 12 were sentenced to straight probation or 1 day in jail with a term of supervised release—defendants Baxter (number 1), Carnes (number 2), Cesan (number 4), Chin (number 5), DeJong (number 7), Finch (number 10), Herman (number 13), McCauliffe (number 17), Murphy (number 18), Nee (number 19), Nee (number 20), and Wilson (number 27).

The chart further demonstrates that defendants in the similar and related Brockton RMV case received downward variances consistent with the variance recommended by Mr. Butner. For example, defendant Estevan Semedo (number 25), whose GSR was 18-24 months for bribing an RMV tester over 70 times, with total bribes of $17,000 and the defendant likely keeping another $17,000 for himself, was sentenced by this Court to 6 months imprisonment and 6 months of home confinement. *U.S. v. Semedo*, 23-cr-10055-IT, Dkt. 14 at 5; Dkt. 18 at 2; Sentencing Transcript at 5. Similarly, defendant Ngan Dinh (number 8), whose GSR was 6-12 months for bribing an RMV examiner $3,000-$4,000 for 30-40 road tests and kept most of the money paid by the test takers for himself, was sentenced to 6 months of home detention. *U.S. v. Dinh*, 24-cr-10029-PBS, Dkt. 17 at 2-4. Finally, defendant Mia Cox-Johnson (number

---

[2] See Docket No. 274 , Exhibit A.

6), a Brockton RMV branch manager whose GSR was 12-18 months for taking cash bribes in exchange for guaranteeing passing scores on CDL learner's permit written tests, was sentenced to four months in prison. *U.S v. Cox-Johnson*, 23-cr-10056-DJC, Dkt. 19 at 2.

While the individual cases for each of the above defendants present unique and different circumstances, they demonstrate with consistency that defendants in this district with similar cases, similarly low GSR's and who accept responsibility for their offenses routinely receive downward sentencing variances.

### E. National Sentencing Data Supports the Recommended Variance

Whether or not the Court applies the 2-level enhancement under U.S.S.G. § 2J1.2(b)(3)(C), the variance requested here is consistent with the sentences imposed nationally for similar offenses. During the last five fiscal years (FY2020-2024), there were 8 defendants, none of whom received a 5K substantial assistance departure, whose primary guideline was §2J1.2, with a Final Offense Level of 11 and a Criminal History Category of I. Five of these defendants were sentenced to probation or a fine and three defendants received a sentence of imprisonment. During the last five fiscal years (FY2020-2024), according to JSIN statistics, nationally there were 43 defendants whose primary guideline was §2J1.2, with a Final Offense Level of 13 and a Criminal History Category of I. PSR, ¶¶146-148. Of the 43 cases prosecuted, 60% of the defendants were granted a non-5K downward departure or variance, 21% received a substantial assistance departure and only 12% were sentenced within the GSR. PSR, ¶148. Of the 34 defendants within this group who did not receive substantial assistance departures, 35% received sentences of probation or a fine. PSR, ¶148.

## Conclusion

For the reasons set forth above, the defendant submits that a sentence of time served, with one year of supervised release and a condition that Mr. Butner serve 6 months of home confinement is appropriate under the circumstances of this case and represents a fair and measured balancing of the sentencing guidelines, the offender, the offense characteristics, and the need to afford adequate deterrence and promote respect for the law.

Respectfully Submitted,
Calvin Butner,
By His Attorney

/s/ William H. Connolly
William H. Connolly
BBO # 634501
20 Park Plaza, Suite 1000
Boston, MA 02116
617-866-8610

## Certificate of Service

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) and paper copies will be sent to those indicated as non-registered participants on August 6, 2025.

/s/ William H. Connolly